[No. E001223. Fourth Dist., Div. Two. Apr. 9, 1985.]

In re NEIL W. HANDA on Habeas Corpus.

**COUNSEL**

John K. Van de Kamp, Attorney General, Frederick R. Miller, Jr., and Raquel M. Gonzalez, Deputy Attorneys General, for Appellant.

Turner & Smart and Robert B. Laney for Respondent.

**OPINION**

**RICKLES, J.**—Defendant Neil Handa, a prisoner now serving a life sentence for first degree murder, brought this habeas corpus proceeding to obtain a new *Stanworth* hearing to set his parole release date under the pre-1978 Indeterminate Sentence Law regulations. (See *In re Stanworth* (1982) 33 Cal.3d 176 [187 Cal.Rptr. 783, 654 P.2d 1311].) The trial court granted the relief requested and the People have appealed.

## FACTS

During the early hours of August 7, 1972, defendant murdered Bruno Bertoni in Bertoni's motel room in Colton. Defendant had been staying in a nearby room under an assumed name. Defendant put Bertoni's body in Bertoni's automobile and used the towels from his own room to mop up the blood. Defendant drove Bertoni's automobile to Victorville where he cashed Bertoni's traveler's checks and obtained medical attention for his swollen right hand. Defendant drove to Needles where he spent the night at a motel, registering in Bertoni's name. Defendant put Bertoni's body in a ditch near the highway and covered it with rocks and debris. Defendant abandoned Bertoni's automobile on August 31 at the airport in Seattle, Washington. Defendant flew to Hawaii where he obtained employment using Bertoni's name and identification papers. Defendant was arrested in Hawaii for Bertoni's murder on November 24, 1972.

Defendant's trial was held in November 1973. Bertoni's body had not been identified. Defendant testified in his own behalf, claiming he did not know what had happened to Bertoni and was innocent of all charges. Defendant was convicted of first degree murder, forgery, and grand theft auto. He was sentenced to the term prescribed by law on each count, with the sentences to run concurrently.

Defendant continued to protest his innocence during the years following his convictions, but he was told he would never be found eligible for parole until he admitted his guilt and revealed the location of Bertoni's body. Defendant's appeal from the judgment of conviction was unsuccessful. On December 5, 1974, the judgment was affirmed by an opinion of this court and the remittitur issued on February 4, 1975.

In 1978, defendant for the first time indicated he would acknowledge guilt and reveal the location of the victim's body. A parole eligibility hearing was held on December 4, 1978. Defendant told the panel of the Community Release Board that he had been burglarizing Bertoni's motel room when Bertoni suddenly returned. Defendant said he was on amphetamines and had not slept for some days. He hit Bertoni with his fists and Bertoni died. He described the location near Needles where he had concealed the body.[1] The board found defendant eligible for parole and set his term, using the determinate sentencing law (DSL) criteria, at 184 months, resulting in a parole release date in March 1988. Defendant had progress hearings in 1979 and 1980, resulting in advancement of his release date by eight months to July 1987. The next progress hearing was scheduled for November 1983.

---

[1]With this information, police determined that a body found near Needles in 1973 was that of the victim.

In December 1982, our Supreme Court decided in *Stanworth* that a prisoner serving a life term under a pre-DSL conviction, and who had been found suitable for parole, was entitled to have parole release dates calculated according to both the Indeterminate Sentence Law (ISL) and the DSL, and to be released on the earlier of the two dates. (*In re Stanworth, supra,* 33 Cal.3d at p. 188.)

In May 1983, a *Stanworth* hearing was held to determine defendant's parole release date under ISL standards. At the conclusion of the hearing, defendant's total period of confinement under ISL was set at 168 months. His next progress hearing was scheduled for May 1985. Defendant filed an administrative appeal from the decision, but the appeal was denied effective September 28, 1983. Defendant then commenced this proceeding in habeas corpus.

The petition was submitted on the documents introduced by either side and on a tape recording of the *Stanworth* hearing. The trial court ruled by minute order, stating in relevant part: "The Court finds that the hearing failed to afford Petitioner procedural due process in that the hearing panel failed to specifically characterize petitioner's base offense as 'typical' or 'aggravated' as they were required to do by the former ISL Parole Board Rules. The Court further finds that even if it be assumed that the parole hearing panel characterized petitioner's base offense as 'aggravated' by implication they failed to state in the record sufficient specific factual reasons for their finding in that the principal factor mentioned was not based solely on the seriousness of the base offense but related to events occurring years after the offense was committed. The Court further finds that the record of the hearing fails to state what consideration, if any, the panel gave to mitigating factors relating to petitioner's drug usage at the time of the offense. . . . Petitioner's alternate request that this Court order that he be afforded a hearing de novo under the conditions set forth in *In re Stanworth* is GRANTED."

I

■ At a *Stanworth* hearing, the ISL parole release date is determined according to the administrative regulations in effect immediately before adoption of the DSL. (*In re Stanworth, supra,* 33 Cal.3d at p. 183.) These regulations, promulgated in 1976, "represented the first and only published guidelines for parole under the ISL." (*Ibid.*) They are section 2200 et seq. of former title 15 of the Administrative Code.

The parole release date is calculated by first selecting one of the commitment offenses, usually the most serious, as the base offense. The panel then

sets a base period of confinement determined solely by the gravity of the base offense. The rules contain a table of suggested base ranges for each felony crime to serve as general guidelines and not as absolute limits. The total period of confinement is determined by applying certain adjustments to the base period. Adjustments may be based on preconviction factors such as criminal record and family history, offense factors such as number of victims, weapons used, and other offenses sentenced consecutively, and postconviction factors including behavior in prison. The ISL panel has broad discretion in deciding what factors merit adjustments and how many months to add or subtract for each adjustment. (*In re Stanworth, supra,* 33 Cal.3d at pp. 183-184.)

In the ISL rules, the suggested base ranges for all crimes except first and second degree murder are in two categories, typical and aggravated. For first and second degree murder, however, there is a single range for each, with the range for first degree murder being 8 to 13 years.

Section 2352 of the ISL rules provides: "The base offense will be characterized as a 'typical' or 'aggravated' crime of that type using the criteria of Sections 2200-2202 and 2357-2358. The hearing panel will list specific factual reasons for characterizing an offense as aggravated. Characterization of a base offense as 'typical' or 'aggravated' will be based solely on the seriousness of the base offense."

Defendant's base offense was first degree murder. The panel selected 13 years (156 months) as the base period of confinement, the maximum in the suggested range. The panel added one year for the forgery conviction and one year for the grand theft auto conviction. The panel subtracted one year for defendant's exceptionally good postconviction performance in the prison system. Thus the total period of confinement was set at 14 years (168 months).

The trial court found that the panel erred in failing to characterize the murder of Bertoni as either "typical" or "aggravated" under section 2352. On appeal, the Attorney General argues that it was unnecessary to characterize the crime because there is only a single suggested base range for first degree murder rather than separate "typical" and "aggravated" ranges as for most other crimes. Alternatively, the Attorney General argues that the panel did find the crime to be aggravated even though the word "aggravated" was not used.

Because the latter argument is clearly meritorious, we need not consider the former.

The panel's decision was announced orally as follows: "We feel the murder is worse than most. It is hard to describe a good murder, but because of the innocent victim who apparently blundered onto your [i.e., defendant's] committing another crime and the fact the body was concealed for such a long period of time, we envisioned a great deal of trauma suffered by the family. We felt that merited extra punishment, so we are assessing you at 156 months for the crime itself, which you probably have noticed is the maximum in the suggested range."

An aggravated crime is one that is worse than most. When the panel found the murder of Bertoni to be "worse than most," it found the crime to be aggravated. There is no special magic in the word "aggravated" and the use of equivalent language does not invalidate the finding.

## II

■ The Attorney General next challenges the court's finding that the ISL panel "failed to state in the record sufficient specific factual reasons for their finding in that the principal factor mentioned was not based solely on the seriousness of the base offense but related to events occurring years after the offense was committed."

As stated above, section 2352 of the ISL regulations provides that characterization of the base offense as "aggravated" must be based solely on the circumstances of the offense. The panel here found the murder of Bertoni to be aggravated "because of the innocent victim . . . and the fact the body was concealed for such a long period of time."

The long interval of time before the body of Bertoni was identified resulted both from the manner in which the crime was committed and from circumstances after the offense was complete. Defendant's conduct in transporting the body approximately 200 miles, placing it in a ditch in a remote area, and covering it with rocks and debris, was part of the commission of the offense and would have been an aggravating factor even if the body had been discovered and identified immediately. On the other hand, defendant's failure to disclose the location of the body for a period of years was not a circumstance of the offense and could not by itself be a reason for characterizing the crime as aggravated.

Although these two factors, the concealment and the failure to disclose, can be separated by process of analysis, the ISL panel can be excused for combining them in its statement of reasons because both factors contributed to the long delay in the identification of the body. Findings of the ISL panel should not be reviewed in a hypertechnical manner. The panel identified

two proper factors in aggravation—the innocence of the victim and defendant's conduct in concealing the body. These two factors are sufficient to support the characterization of the offense as aggravated. The reference to defendant's long silence about the location of the body was harmless error.

### III

■ Finally, the Attorney General argues that the ISL panel was not required to acknowledge defendant's use of amphetamines as a mitigating factor.

In the sentencing report prepared in 1973 after defendant's conviction, the probation officer included a statement by defendant. While denying his guilt, defendant mentioned he had been using amphetamines "in quantities of one hundred to one hundred and twenty per day for six or seven days straight." The report also included a portion of a psychiatric evaluation stating: "Although the defendant admits being under the influence of stimulating drugs at the time of the alleged offense, it is my professional opinion that this condition would not significantly diminish his capacity to judge right from wrong."

Defendant's use of amphetamines was one of the facts presented to the ISL panel for its consideration. The panel included a drug-testing condition in the parole terms but did not expressly refer to drug use as an aggravating or mitigating factor.

In deciding the scope of the ISL panel's responsibility to give reasons for its decision, it is useful to look at the comparable responsibility of a sentencing court under the DSL to give reasons for imposing an upper term or denying probation or running counts consecutively. Certainly an ISL panel should not be held to higher standards than a sentencing court.

■ A sentencing court errs in disregarding an undisputed factor in mitigation. (*People* v. *Burney* (1981) 115 Cal.App.3d 497, 505 [171 Cal.Rptr. 329].) However, many alleged factors in mitigation are disputable either because they may not be established by the evidence or because they may not be mitigating under the circumstances of a particular case. Where an alleged factor in mitigation is disputable, the court may find an absence of mitigating factors and need not explain the reason for its conclusion. (*People* v. *Simon* (1983) 144 Cal.App.3d 761, 766 [193 Cal.Rptr. 28]; *People* v. *Lambeth* (1980) 112 Cal.App.3d 495, 500 [169 Cal.Rptr. 193].)

Drug use or drug addiction at the time of an offense is an example of a disputable factor in mitigation. The sentencing court may find that drug use

did not significantly affect the defendant's capacity to exercise judgment or, in the case of an addiction of long standing, that the defendant was at fault for failing to take steps to break the addiction. (*People* v. *Reid* (1982) 133 Cal.App.3d 354, 370-371 [184 Cal.Rptr. 186]. See also, *In re Plotner* (1971) 5 Cal.3d 714, 727-728 [97 Cal.Rptr. 193, 488 P.2d 385].)

■■■ The ISL panel could reasonably reject defendant's alleged drug use das a factor in mitigation. It could reasonably find that drug use did not significantly impair defendant's mental abilities and therefore did not in any way tend to excuse his conduct. No explanation of the panel's reasoning process was required by the ISL rules and the analogy to a sentencing court's responsibilities under DSL indicates that no such requirement should be judicially imposed.

The order granting the petition for writ of habeas corpus is reversed with directions to deny the petition.

Morris, P. J., and McDaniel, J., concurred.